UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Lynda Crandall,                                    File No. 20-cv-1793 (ECT/LIB)

        Plaintiff,

v.                                                      **OPINION AND ORDER**

Miller & Stevens, P.A.,

        Defendant.

---

Mark L. Vavreck, Gonko & Vavreck, PLLC, Minneapolis, MN, for Plaintiff Lynda Crandall.

J. Vincent Stevens, Miller & Stevens, P.A., Forest Lake, MN, for Defendant Miller & Stevens, P.A.

---

Plaintiff Lynda Crandall alleges that Defendant Miller & Stevens, P.A., a law firm, violated the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq.*, and committed the Minnesota common-law torts of malicious prosecution and abuse of process. Crandall alleges that these violations occurred when Miller & Stevens sought to collect a debt that she owed to one of the law firm's clients, Bear Roofing & Exteriors, Inc.

Crandall and Miller & Stevens have filed cross-motions for summary judgment. Crandall appears to seek summary judgment on each of her claims with respect to liability only, *see* Pl.'s Mem. in Supp. at 24 [ECF No. 40], and as to the "bona fide error" affirmative defense asserted by Miller & Stevens under 15 U.S.C. § 1692k(c), *see id.* at 19–22. Miller & Stevens seeks summary judgment outright on several grounds.

Crandall's motion will be denied, and Miller & Stevens's motion will be granted. Crandall's FDCPA claims fail because the record evidence shows that Miller & Stevens is not a "debt collector" as the FDCPA defines that term, meaning the FDCPA did not govern the law firm's suit-provoking debt-collection activities. Crandall's state-law claims fail because she has not identified record evidence tending to establish essential elements of each claim.

I

Crandall's claims arise from undisputed facts. On May 8, 2014, hail damaged the roof on Crandall's Maplewood, Minnesota residence. Def.'s Ex. U at 1–2 [ECF No. 48-1 at 175–76]. Crandall hired Bear Roofing to install a new roof. Def.'s Ex. A ¶ 2 [ECF No. 48-1 at 2]. Bear Roofing completed the job and billed Crandall. *See* Def.'s Ex. Q at 2–3 [ECF No. 48-1 at 162–63]; *see also* Def.'s Ex. U at 13 [ECF No. 48-1 at 187]; Def.'s Ex. C [ECF No. 48-1 at 13]. But Crandall did not pay Bear Roofing what she owed. Def.'s Ex. Q at 1 [ECF No. 48-1 at 161]; Def.'s Ex. C. Around September 2019, Bear Roofing hired Defendant Miller & Stevens to help collect Crandall's debt. Def.'s Ex. B ¶¶ 2, 4 [ECF No. 48-1 at 5]. On October 9, 2019, Miller & Stevens sent Crandall a letter regarding the Bear Roofing debt. Def.'s Ex. C. The letter read, in part:

> Please be advised that you are in default and you have 10 days to make full payment. If Bear Roofing does not receive payment in full within 10 days, we will have no choice but to file a lawsuit against you and record the judgment as a lien against your property. Also, please be aware that a judgment may be increased by statutory interest and legal fees. Bear Roofing will also engage in all available remedies for collections, including wage garnishment, bank levies, and property repossession.

2

*Id.* Crandall filed for Chapter 13 bankruptcy on November 13, 2019. Pl.'s Ex. G ¶ 2 [ECF No. 41-7]. On December 17, Miller & Stevens filed a case on behalf of Bear Roofing against Crandall in Ramsey County Conciliation Court, seeking to recover the debt. Def.'s Ex. D [ECF No. 48-1 at 15–16]. In a letter to Bear Roofing dated January 8, 2020, Crandall's bankruptcy counsel wrote that the Conciliation Court case violated the Bankruptcy Code's automatic stay and asked that Bear Roofing "cease any and all collection efforts and dismiss this claim immediately." Def.'s Ex. F [ECF No. 48-1 at 21–22]. Miller & Stevens dismissed the Conciliation Court case two days later, on January 10. Def.'s Ex. R [ECF No. 48-1 at 165–66].

Behind these straightforward facts lies something of a complication: in the midst of these events, Crandall changed her name.[1] When she hired Bear Roofing, Crandall went by "Lynda Kaye Fisher." It appears that she went by Lynda Kaye Fisher up until some point before Bear Roofing hired Miller & Stevens, and before she filed for bankruptcy. At the time of her bankruptcy, her name had changed to Lynda Kaye Crandall. *See* Pl.'s Ex. G at 1 [ECF No. 41-7 at 1]. (The record does not identify the exact date Crandall changed her name from Fisher to Crandall, but that is of no consequence.) When Bear Roofing hired Miller & Stevens to assist in collecting Crandall's debt, Bear Roofing identified Crandall as "Linda Fischer." Def.'s Ex. A ¶¶ 2, 6 [ECF No. 48-1 at 2, 3]; Def.'s Ex. B ¶ 23 [ECF No. 48-1 at 9]. In other words, Bear Roofing gave Miller & Stevens inaccurate

---

[1] For context, Miller & Stevens asserts that Crandall's name change explains and justifies the law firm's mistake in filing the Conciliation Court case during the pendency of Crandall's bankruptcy. Crandall disagrees.

information about Crandall.  The information Bear Roofing provided to Miller & Stevens about Crandall was incorrect in three ways: (1) Crandall's first name is "Lynda," not "Linda," as Bear Roofing indicated; (2) before she changed her name to Crandall, her last name was "Fisher," but Bear Roofing identified her as "Fischer"; and (3) Crandall had changed her name by the time Bear Roofing retained Miller & Stevens, so she was no longer using the name "Lynda Kaye Fisher."  *See* Pl.'s Ex. G at 1 [ECF No. 41-7 at 1].  As a result of all of this, Miller & Stevens's October 9, 2019 collection letter was addressed incorrectly to "Linda Fischer."  Def.'s Ex. C [ECF No. 48-1 at 13].   And the statement of claim that Miller & Stevens filed in Conciliation Court incorrectly named "Linda Fischer" as the defendant.  Def.'s Ex. D at 1 [ECF No. 48-1 at 15].  Notice of Crandall's bankruptcy filing was mailed to Bear Roofing, and the notice included Crandall's full name and the fact that she formerly was known as Lynda Kaye Fisher.  Pl.'s Ex. G at 1, 3 [ECF No. 41-7 at 1, 3].  Miller & Stevens received the notice.  Def.'s Ex. X ¶¶ 3–4 [ECF No. 48-1 at 203].  On November 18, 2019, Miller & Stevens's office manager emailed the following message to all firm members: "Our office received a bankruptcy notice for Lynda Kaye Crandall.  We think it may have been sent to our office in error, please let me know if you believe otherwise.  Thanks!"  Def.'s Ex. T [ECF No. 48-1 at 173]; *see also* Def.'s Ex. X. ¶ 4.  Evidently, no firm member responded indicating that she or he knew of Crandall.  *See* Def.'s Ex. B ¶ 25 [ECF No. 48-1 at 9].

   Crandall's FDCPA claims focus on two of the law firm's collection activities: the October 9 demand letter and the filing of the Ramsey County Conciliation Court case.  Crandall alleges that the October 9 letter violated the FDCPA because it did not

include a "validation notice" required by 15 U.S.C. § 1692g(a) that would have informed Crandall of certain rights, including that she had thirty days to dispute the alleged debt, and because the letter overshadowed or was inconsistent with her rights to dispute the debt in violation of 15 U.S.C. § 1692g(b). Am. Compl. ¶¶ 24–30 [ECF No. 16]. Crandall alleges that the commencement of the Conciliation Court case "was a false and deceptive attempt to collect a debt in violation of numerous and multiple provisions of the FDCPA," essentially because the demand was made while Crandall was in bankruptcy and the debt "had already been included in her bankruptcy[.]" Am. Compl. ¶ 50. Crandall's malicious-prosecution and abuse-of-process claims also are premised on the allegation that Miller & Stevens filed the Ramsey County Conciliation Court case improperly without regard to Crandall's prior bankruptcy filing. *Id.* ¶¶ 72–83. Crandall alleges that she has suffered various injuries, including the need "to expend time and resources to defend herself and vindicate her rights[,]" *id.* ¶ 46, negative impacts on her "family relationships" and her "marriage[,]" *id.* ¶ 47, and "emotional distress, anxiety, and mood swings[,]" *id.* ¶ 49. She seeks to recover actual and statutory damages and attorney's fees and costs. *See id.* at 24–25.[2]

## II

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute over a fact is "material" only if its resolution "might

---

[2]     In addition to Miller & Stevens, Crandall originally sued, but has since voluntarily dismissed, Bear Roofing. ECF Nos. 27, 29.

affect the outcome of the suit" under the governing substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.  Courts take a slightly modified approach where, as here, there are cross-motions for summary judgment.  *Fjelstad v. State Farm Ins. Co.*, 845 F. Supp. 2d 981, 984 (D. Minn. 2012).  When considering Miller & Stevens's motion, the record must be viewed in the light most favorable to Crandall, and when considering Crandall's motion, the record must be viewed in the light most favorable to Miller & Stevens.  *See id.*  Importantly, "the filing of cross motions for summary judgment does not necessarily indicate that there is no dispute as to a material fact, or have the effect of submitting the case to a plenary determination on the merits."  *Wermager v. Cormorant Twp. Bd.*, 716 F.2d 1211, 1214 (8th Cir. 1983).

III

Miller & Stevens seeks summary judgment on a jurisdictional ground: it argues that Crandall's claim that she suffered personal injuries as a result of Miller & Stevens's conduct "is simply not believable, and no jury could reasonably find in favor of Crandall on this point."  Def.'s Mem. in Supp. at 37 [ECF No. 47].  Although Miller & Stevens does not characterize this argument explicitly as a challenge to "subject-matter jurisdiction," it argues that the non-believability of Crandall's claimed injuries means Crandall "lacks standing" and, in support, cites *Spokeo, Inc. v. Robins*, 578 U.S. 330, 136 S. Ct. 1540 (2016), a case that "primarily concerns injury in fact" as an element of Article III's standing

requirements, *id.*, 136 S. Ct. at 1547. Miller & Stevens does not suggest that the damages Crandall identifies are not recoverable under either the FDCPA or Minnesota common law. *See* Def.'s Mem. in Supp. at 37–38. In other words, lack of specificity aside, it only makes sense to understand this argument as challenging subject-matter jurisdiction.

To plead Article III standing, a plaintiff must allege facts showing it has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc.*, 136 S. Ct. at 1547. "To establish injury in fact, a plaintiff must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Id.* at 1548 (internal quotation marks omitted) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). But "[s]tanding under Article III to bring a claim in federal court is distinct from the merits of a claim[.]" *Enter. Fin. Grp., Inc. v. Podhorn*, 930 F.3d 946, 950 (8th Cir. 2019).

Crandall (obviously) has shown a trial-worthy injury in fact, and there is subject-matter jurisdiction over this case. Crandall's FDCPA claims arise under federal law. There is subject-matter jurisdiction over those claims specifically under 15 U.S.C. § 1692k(d) and more generally under 28 U.S.C. § 1331. There is supplemental jurisdiction over Crandall's state-law tort claims because they arise from the same facts as the FDCPA claims. 28 U.S.C. § 1367(a); *United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966). Crandall claims to have suffered personal injuries caused by Miller & Stevens's violations of the FDCPA and Minnesota common law. In a series of interrogatory answers that she signed, Crandall describes suffering numerous harms resulting from Miller & Stevens's

sued-on conduct: "many disputes" and "conflict between [Crandall] and her husband[]" prompting a separation and marital counseling, an increase in "stress, anxiety, migraines, and emotions and moods[,]" "problems sleeping, anxiety," and "PTSD and depression." Def.'s Ex. Y at 5–6 [ECF No. 48-1 at 210–11]. As far as Article III is concerned, this kind of case (*i.e.*, a tort suit seeking recovery of personal injuries) is a no-doubter.

As noted, Miller & Stevens says that Crandall can show no Article III injury because her assertions regarding the extent of her personal injuries are "not believable." Def.'s Mem. in Supp. at 37. Miller & Stevens says that Crandall will not be able to prove these injuries at trial because they "are too farfetched." Def.'s Mem. in Supp. at 38. This is especially true, the law firm argues, "with a jury who is unlikely to be sympathetic to someone [Crandall] who took money belonging to someone else [Bear Roofing]." *Id.*

The law firm's position is flawed for two basic reasons: (1) It combines the Article III injury question with the merits of Crandall's claims, when they should be distinct. Along with the nature of her claims, Crandall's claimed damages show that she has a personal stake in the case, and that is enough for Article III. Article III does not care if a jury eventually rejects Crandall's damages-related testimony. That goes to the merits of her claims for damages. To put it bluntly, there is no risk of expanding the judicial power beyond Article III's limits in this case or in any case like it. (2) If that weren't so (it is), accepting Miller & Stevens's argument would require construing Crandall's evidence as "farfetched" and unlikely to be accepted by a jury—in other words, in a light unfavorable

to Crandall and favorable to Miller & Stevens.  In the context of Miller & Stevens's motion, Rule 56 forbids that.[3]

IV

A

Whether Miller & Stevens is a "debt collector" as the FDCPA defines that term is central to both Parties' summary-judgment motions.  "The FDCPA imposes civil liability only on debt collectors, as they are defined by the statute[,]" so "if [Miller & Stevens] is not a debt collector for purposes of the FDCPA, the statute does not apply, and [Crandall's FDCPA] claims fail."  *Volden v. Innovative Fin. Sys., Inc.*, 440 F.3d 947, 950 (8th Cir. 2006).   The FDCPA defines a debt collector as "[1] any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or [2] who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another."  15 U.S.C.

---

[3]     Regarding Crandall's FDCPA claims specifically, it is true that a plaintiff does not "automatically satisf[y] the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right."  *Spokeo*, 136 S. Ct. at 1549; *see TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2205 (2021) ("Congress's creation of a statutory prohibition or obligation and a cause of action does not relieve courts of their responsibility to independently decide whether a plaintiff has suffered a concrete harm under Article III any more than, for example, Congress's enactment of a law regulating speech relieves courts of their responsibility to independently decide whether the law violates the First Amendment.").  But Miller & Stevens does not argue that Congress transgressed Article III when it enabled one or more of Crandall's FDCPA claims.  In fact, that argument would not seem plausible here, in view of the Eighth Circuit's recognition that the kind of violations Crandall alleges can "cause reasonable people mental distress, [and] create the risk of real, concrete harms."  *Demarais v. Gurstel Chargo, P.A.*, 869 F.3d 685, 692 (8th Cir. 2017) (addressing attempts to collect extinguished debt).

§ 1692a(6).  Crandall argues that Miller & Stevens falls in the second category—*i.e.*, that it "regularly collects" debts.  Crandall does not argue that Miller & Stevens's "principal purpose" is debt collection.  It is settled that § 1692a(6) encompasses lawyers "who 'regularly' engage in consumer-debt-collection activity, even when that activity consists of litigation."  *Heintz v. Jenkins*, 514 U.S. 291, 299 (1995).

So how does one determine whether a lawyer or law firm "regularly collects" debts? Neither the Supreme Court nor the Eighth Circuit has answered the question.  *See Dubeck v. Marion Law Offices*, No. 8:20-cv-149, 2021 WL 4355580, at *2 (D. Neb. Sept. 24, 2021); *Lynch v. Custom Welding & Repair, Inc.*, 142 F. Supp. 3d 814, 821 (N.D. Iowa 2015).  But there seems to be a consensus among the many courts that have.  This consensus starts with a Second Circuit case: *Goldstein v. Hutton, Ingram, Yuzek, Gainen, Carroll & Bertolotti*, 374 F.3d 56 (2d Cir. 2004).  There, the court identified a non-exhaustive list of factors relevant to this inquiry:

> (1) the absolute number of debt collection communications issued, and/or collection-related litigation matters pursued, over the relevant period(s), (2) the frequency of such communications and/or litigation activity, including whether any patterns of such activity are discernable, (3) whether the entity has personnel specifically assigned to work on debt collection activity, (4) whether the entity has systems or contractors in place to facilitate such activity, and (5) whether the activity is undertaken in connection with ongoing client relationships with entities that have retained the lawyer or firm to assist in the collection of outstanding consumer debt obligations.  Facts relating to the role debt collection work plays in the practice as a whole should also be considered to the extent they bear on the question of regularity of debt collection activity (debt collection constituting 1% of the overall work or revenues of a very large entity may, for instance, suggest regularity, whereas such work constituting

> 1% of an individual lawyer's practice might not). Whether the
> law practice seeks debt collection business by marketing itself
> as having debt collection expertise may also be an indicator of
> the regularity of collection as a part of the practice.

*Id.*, 374 F.3d at 62–63. The Tenth Circuit explicitly has adopted this approach. *James v. Wadas*, 724 F.3d 1312, 1318 (10th Cir. 2013) ("We agree with and adopt the standard set forth by the Second Circuit in *Goldstein*."). Other Circuits have cited *Goldstein* approvingly. *Oppong v. First Union Mortg. Corp.*, 215 F. App'x 114, 119 (3d Cir. 2007); *Hester v. Graham, Bright & Smith, P.C.*, 289 F. App'x 35, 41–42 (5th Cir. 2008); *Bates v. Green Farms Condo. Ass'n*, 958 F.3d 470, 481 (6th Cir. 2020). And so have many district courts. *E.g.*, *Wells v. LF Noll, Inc.*, No. 18-cv-2079-CJW-KEM, 2019 WL 5596409, at *6–7 (N.D. Iowa Oct. 30, 2019).

Other related considerations seem widely accepted and illuminate application of the *Goldstein* analysis. The definition of "regularly" matters. It means "'[a]t fixed and certain intervals, regular in point in time. In accordance with some consistent or periodical rule or practice.'" *Wadas*, 724 F.3d at 1316 (quoting *Black's Law Dictionary* 1286 (6th Ed. 1990)). "In turn, the term 'regular' means 'steady or uniform in course, practice, or occurrence . . .[,] [u]sual, customary, normal or general.'" *Id.* at 1316 (quoting *Black's Law Dictionary* 1285 (6th Ed. 1990)). Also, the *Goldstein* inquiry is "case-by-case[,]" *Goldstein*, 374 F.3d at 62, and is not a bright-line test, *Hester*, 289 Fed. App'x at 41. "But this much seems clear: such debt collection [meeting the "regularly collects" threshold] cannot be isolated or incidental but must, to varying degrees, be a significant aspect of the attorney's business." *Wadas*, 724 F.3d at 1317.

11

*The relevant period.*   The Parties do not agree on a relevant period, and each is unclear about what should be the relevant period.   Crandall has identified four different periods—three in her summary-judgment submissions and another during discovery.   In an appendix to her opening summary-judgment brief, she identifies 61[4] debt-collection communications issued, or litigation matters filed, by Miller & Stevens between October 27, 2011 and February 11, 2020.   Pl.'s Mem. in Supp., App'x [ECF No. 40 at 27–30].   That's more than 8 years.   Crandall does not explain why this seemingly lengthy period might be relevant for determining whether Miller & Stevens is a "debt collector."   Crandall identifies a different, second interval in her opening brief.   There, Crandall suggests the relevant period is "the two years prior to filing this action[,]" *id.* at 9, or August 17, 2018, to August 17, 2020, *see* Compl. [ECF No. 1].   Again, Crandall does not explain why a two-year look-back period is the right one.   Crandall identifies a third relevant period in her brief in opposition to Miller & Stevens's motion.   There, Crandall suggests that the relevant period should be "January 2019 through August 2020 (twenty months prior to filing this action)[.]"   Pl.'s Mem. in Opp'n at 7–8 [ECF No. 51].   Crandall defends a 20-month period by asserting that "courts determining whether an attorney is a debt collector consistently look [at] debt collection in a time frame between one and two years."   *Id.* at 7 (citing cases).   Finally, in written discovery requests, Crandall asked Miller & Stevens to

---

[4]   Crandall's Appendix is numbered 1 through 60, implying she has identified only 60 matters.  This is off by one.  The mistake occurs in that part of the appendix labeled "Bear Roofing Files."  There, Crandall identifies "33" such files, but labels these 33 files as numbers "11–42" (or only 32 numbers).  Crandall should have labeled these files as numbers 11–43.

identify consumer-debt-collection clients and matters going back five years.  Def.'s Ex. J at 3 [ECF No. 48-1 at 63].

Miller & Stevens identifies several periods but does not commit to or justify any one of them.  In its opening brief, Miller & Stevens discusses, in descending order: the period "since its founding in 1998"; "case file lists since 2008"; the past 10 years; the past 5 years; the past 3 years; the "years of 2019–2021"; and "the past year[.]"  Def.'s Mem. in Supp. at 7, 9–13.  Miller & Stevens discusses many of these same periods in its brief in opposition to Crandall's motion.  *See* Def.'s Mem. in Opp'n at 3–6, 9–11 [ECF No. 53].  Miller & Stevens does not say which of these periods is the relevant one.  (In fairness, Miller & Stevens's point seems to be that no matter what time frame is considered, it did not regularly collect consumer debt.)

For several reasons, the best way to answer the relevant-period question in this case is not to adopt a rigid date range but instead to apply a general rule that evidence from closer in time to the alleged FDCPA violations should carry greater weight than evidence from a more distant time.  This seems logical: if the point of the *Goldstein* analysis is to determine whether Miller & Stevens regularly collected debt when it engaged in the conduct prompting this suit (in the latter half of 2019), then what Miller & Stevens was doing around that time vis-à-vis debt collection should matter more than what happened several years earlier.  In that same vein, what Miller & Stevens was doing two years before generally should be more informative than what it was doing five years earlier, and so forth.  That is not to suggest that Miller & Stevens's origins or more distant past are irrelevant.  It is to say they probably are far less relevant to answering the "regularly-collects" question

than what the law firm was doing closer in time to its litigation-provoking activities. This approach also makes good sense in view of *Goldstein* and the cases applying its test. *Goldstein* did not identify standards for determining an applicable period. The Parties have not cited, and research has not identified, a case doing that. And district courts have applied widely varying periods, *compare Chung v. Lamb*, No. 14-cv-03244-WYD-KLM, 2017 WL 10777666, at *3 (D. Colo. Sept. 28, 2017) (applying 14-year period) *with Hester v. Graham, Bright & Smith, P.C.*, No. 6:04cv36, 2005 WL 994704, at *4 (E.D. Tex. Apr. 1, 2005) (applying 2-year period), *aff'd*, 289 F. App'x 35, 41 (5th Cir. 2008), suggesting at least that the issue requires case-specific consideration. Finally, this approach makes sense because the Parties have not really proposed an alternative: they neither agree on nor identify authority that would support adopting any fixed range as the relevant period here.

*The absolute number of debt collection communications issued, and/or collection-related litigation matters pursued.* Miller & Stevens argues that some number of the 61 total communications or cases Crandall identifies should not count because they were or are not governed by the FDCPA, but Miller & Stevens's arguments are not persuasive. In its brief in support of its summary-judgment motion, Miller & Stevens argues that "on their face, most of these [61] cases are plainly not covered by the FDCPA." Def.'s Mem. in Supp. at 11. The authority cited for this assertion is an affidavit in which a Miller & Stevens attorney includes the assertion as testimony. Def.'s Ex. B ¶ 16 [ECF No. 48-1 at 7]. This is neither proper nor persuasive. It is not proper because, as a general rule, a factual affidavit is no place to assert a legal conclusion. It is unpersuasive because the assertion

14

lacks any supporting explanation.   Miller & Stevens is more specific in its brief in opposition to Crandall's motion.   There, Miller & Stevens argues:

> In her appendix to her memorandum, Crandall cites to 4 files that would not be covered by the FDCPA.   The 2019 *Stolp v. Blankenship* file (02-CO-19-2019) did not relate to consumer debt.   The plaintiff made an informal loan to a friend to start a landscaping business, which is not for household purposes covered by the Act, and the friend denied ever receiving the money.   In the 2019 *Myers v. Carriage Pass* file (13-CV-19-913), this conciliation action was commenced by a tenant suing a business client for not making repairs.   In *Mell v. Wallace* (13-cv-19-521), a neighbor family member took another family member's money in a fraudulent swindle scam.   In *Bonita Sigstad v. Aaron Lampi* (27-CV19-17957), Ms. Sigstad handled her matter entirely herself and after she obtained a conciliation judgment herself, she mailed a financial disclosure form to Mr. Lampi.   Mr. Stevens merely scheduled an Order to Show Cause hearing but then Mr. Lampi returned the disclosure form, so the hearing was cancelled and nothing was done.

Def.'s Mem. in Opp'n at 7.   These arguments might be correct,[5] but they support an immaterial conclusion.   Specifically, no authority is cited suggesting that it makes a

---

[5]   The *Stolp* matter does not appear to fall within the FDCPA's definition of a "debt." Def.'s Ex. DD [ECF No. 54-1 at 41–46].   In relevant part, the FDCPA defines a "debt" as "any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes[.]"   15 U.S.C. § 1692a(5).   An "informal loan to start a . . . business"—the transaction at issue in *Stolp*—would not appear to fit this definition.   *See Bloom v. I.C. System, Inc.*, 972 F.2d 1067, 1068–69 (9th Cir. 1992) (holding that informal loan between friends for venture capital investment was not a "debt" because it was a business loan and not for personal use).   The *Myers* matter appears to have been brought *against* Miller & Stevens's client over unmade attempts to repair a rental property, and no debt-collection activity or counterclaim is identified.   Def.'s Ex. EE [ECF No. 54-1 at 48–49].   The *Mell* matter seems less clear.   Ex. FF [ECF No. 54-1 at 51–56].   "[T]he FDCPA limits its reach to those obligations to pay arising from consensual transactions, where parties negotiate or contract for consumer-related goods or services."   *Bass v. Stolper, Koritzinsky, Brewster & Neider,*

difference whether the total number of debt-collection communications or cases is 61 (as Crandall contends) or 56 (as Miller & Stevens contends).  In other words, no authority is cited suggesting that, if 61 debt-collection communications or cases are enough to show that Miller & Stevens "regularly collects" debts, 56 would not be, or that, if 56 debt-collection communications or cases are not enough, 61 would be.  The bottom line, then, is that for summary-judgment purposes, Crandall has identified 61 such matters over a more-than-8-year period, and (as discussed in the preceding section) some of these matter more than others in answering whether Miller & Stevens was a debt collector between October 2019 and January 2020.

*The frequency of such communications and/or litigation activity, including whether any patterns of such activity are discernable.*  There is no question a relevant pattern emerges from the 61 matters Crandall has identified: it is undisputed that the frequency of Miller & Stevens's debt-collection activities spiked in 2019 in connection with its representation of Bear Roofing.  Beginning in October 2019, Miller & Stevens mailed 33 collection letters to Bear Roofing customers, and it eventually would file lawsuits against 14 of these individuals.  Pl.'s App'x at 2; *see* Pl.'s Ex. B [ECF No. 41-2 at 41–71, 74, 76–78].  This is a much greater frequency of debt-collection activities than Miller &

---

*S.C.*, 111 F.3d 1322, 1326 (7th Cir. 1997).  But what if the neighbor who was alleged to have swindled money to purchase a home ultimately showed that the transaction was genuine?  Finally, the information Miller & Stevens provides regarding the *Sigstad* matter, Def.'s Ex. GG [ECF No. 54-1 at 58–59], is not enough to show beyond any genuine fact dispute that it fell within the FDCPA.  The information shows that Miller & Stevens was retained to represent a creditor and scheduled an order to show cause on her behalf.  If there is some reason this matter fell outside the FDCPA, it is not evident from the record.

Stevens pursued in earlier years.  Combining the Bear Roofing matters with the 7 other matters Crandall has attributed to 2019, *see* Pl.'s App'x at 1–2, Miller & Stevens initiated 40 of the 61—or roughly two-thirds of the total identified matters—in 2019.  Miller & Stevens did not come close to that number in any other year.  Crandall has identified 3 matters in 2011, 7 in 2012, 1 each in 2013 and 2014, none in 2015, 6 in 2016, none in 2017, 1 in 2018, and 2 in 2020.  *See id.*  No record evidence suggests what the future holds for Miller & Stevens in this regard.[6]

*Whether Miller & Stevens has personnel specifically assigned to work on debt-collection activity.*  It does not.  In an affidavit filed in support of its motion, a Miller & Stevens attorney testifies: "Miller & Stevens has no personnel specifically assigned to work on debt collection activity."  Def.'s Ex. B ¶ 14.  Crandall argues that Miller & Stevens

---

[6]     As noted, the factors identified in *Goldstein* "are illustrative rather than exclusive." 374 F.3d at 62.  In other words, considerations not mentioned in *Goldstein* may be relevant in other cases.  Here, Miller & Stevens's representation of Bear Roofing was limited, and this seems like a relevant—though not dispositive—consideration.  The firm was not involved on Bear Roofing's behalf in important stages of the dispute-resolution process. The firm mailed collection letters and then executed and filed statements of claim in conciliation court.  Def.'s Ex. B ¶ 6.  Miller & Stevens did not send follow-up correspondence or make telephone calls to individual respondents.  *Id.*  It did not appear in court.  *Id.*  As Bear Roofing explains the situation:

> To save costs, Bear Roofing communicated with customers directly and attended a few conciliation hearings itself, without a lawyer.  Bear Roofing merely asked Mr. Stevens to file conciliation claims for administrative convenience (Bear Roofing does not file lawsuits and is not familiar with e-filing), and Bear Roofing would handle the case from there.

Def.'s Ex. A ¶ 4 [ECF No. 48-1 at 2–3].  The relatively limited role for which Bear Roofing retained Miller & Stevens reflects the firm's general-practice character.

nonetheless meets this factor because "two attorneys do effectively all of the firm's debt collection work—i.e., they are assigned to the firm's debt collection cases." Pl.'s Mem. in Opp'n at 9; *see also* Pl.'s Mem. in Supp. at 10. This argument is not persuasive. The only support Crandall cites for this contention is an interrogatory answer in which Miller & Stevens identified information regarding each of its attorney's debt-collection activities. Pl.'s Mem. in Opp'n at 9 (citing Pl.'s Ex. A at 8 [ECF No. 41-1 at 9]); Pl.'s Mem. in Supp. at 10 (same). Of the eight listed attorneys, four billed no time to debt-collection matters in the previous five years, one billed "approx. 1-2 hours," one billed 20 hours, one billed 41 hours, and one billed 48 hours. Pl.'s Ex. A at 8. Crandall cites no direct evidence that Miller & Stevens assigned specific lawyers or other personnel to work on debt-collection matters. She does not, for example, identify evidence showing that these lawyers possessed debt-collection expertise other lawyers in the firm did not, or perhaps that these assignments were not tethered to an attorney-client relationship. She suggests that such an assignment may be inferred from the billable hours provided in these interrogatory answers. That asks too much. These numbers just show that some Miller & Stevens attorneys worked on consumer debt-collection matters. The numbers alone do not show that Miller & Stevens assigned this work to these lawyers because it involved debt collection. To put it another way, the mere fact that some Miller & Stevens lawyers billed a relatively small amount of time to debt-collection matters does not reasonably justify the inference that the firm designated those lawyers specifically to work on debt-collection matters.

*Whether Miller & Stevens has systems or contractors in place to facilitate debt-collection activity.*  Miller & Stevens avers that it "has no systems or contractors in place to facilitate such activity."  Def.'s Ex. B ¶ 14.  Crandall disagrees and says the law firm "ha[s] a system in place for handling debt collection matters."  Pl.'s Mem. in Supp. at 10; Pl.'s Mem. in Opp'n at 9.  (To be clear, Crandall does not argue that Miller & Stevens uses "contractors" to facilitate debt-collection activity, only that is has a "system.")  To show that Miller & Stevens has a system, Crandall describes the "process" the firm generally follows in such matters, citing as support an interrogatory answer in which Miller & Stevens described activities it might pursue in a hypothetical breach-of-contract case, Pl.'s Ex. A at 5–6 [ECF No. 41-1 at 6–7], and a paragraph of the law firm's answer in which the firm described mailing an asset-disclosure form to an individual adversary, Answer ¶ 17 [ECF No. 30].  *See* Pl.'s Mem. in Opp'n at 9 (citing these materials).  These dispute-resolution processes are not specific to debt-collection activity, and logically that can't be enough.  If the point of the *Goldstein* analysis is to separate those law firms that regularly collect debt from those that do not, then identifying litigation processes common to law firms regardless of subject matter isn't helpful.  If that were enough, then every litigation firm would meet this factor.  In *Goldstein*, by contrast, the court identified a debt-collection-specific process that included referring "tenant arrears information to an outside computer service which generated the notices," and assigning a paralegal to review the notices and confirm their accuracy. *Id.*, 374 F.3d at 63.  Crandall doesn't identify anything like that here.

19

*Whether Miller & Stevens undertook the activity in connection with ongoing client relationships with entities that have retained the lawyer or firm to assist in the collection of outstanding consumer debt obligations.*  This factor seems open to genuine dispute.  On the one hand, Miller & Stevens's litigation-provoking activities occurred in connection with its representation of a client (Bear Roofing) that retained the firm to assist in the collection of 33 outstanding consumer debt obligations.  That number of matters and the time it took to complete them suggest the presence of an attorney-client relationship that fairly may be described as "ongoing."  In other words, at least ordinarily, that many matters would require ongoing representation, and in fact the work took several months.  The law firm started its Bear Roofing work with the mailing of collection letters in October 2019 and appears to have concluded almost all of this work by the end of March 2020.  Def.'s Ex. CC [ECF No. 54-1 at 2–10].  Other facts tilt against finding this factor satisfied.  For example, if the factor's plural references to "relationship*s* with entitie*s*" are to be taken literally, then the firm's Bear Roofing relationship alone is not enough and there aren't others like it.  It is true that Miller & Stevens represented other clients in consumer-debt-collection matters, but the record shows those activities were occasional, short-lived, and not in any sense ongoing.  Def.'s Ex. P [ECF No. 48-1 at 157–59]; Pl.'s Ex. B [ECF No. 41-2 at 27–36].

*Facts relating to the role debt collection work plays in the practice as a whole.*  On this question, the relevant record evidence is undisputed.  "Miller & Stevens is a small general practice law firm" that "opens several hundreds of files every year[.]"  Def.'s Ex. B ¶¶ 7, 10.  "[T]he total revenue generated by [Miller & Stevens] in debt collection matters

in the past five years and the percentage of [the firm's] total revenue that was generated by debt collection activities" are $23,079 and .3% respectively.  Def.'s Ex. J at 8 [ECF No. 48-1 at 64].[7]  As of May 2021, Miller & Stevens had received $20,584 in legal fees attributable to the Bear Roofing project specifically, or ".5% of the [firm's] revenue for the . . . years of 2019–2021."  Def.'s Mem. in Supp. at 9.  Federal courts rely routinely on similarly low revenue percentages to find that a law firm is not a debt collector as a matter of law.  *E.g.*, *Dubeck*, 2021 WL 4355580, at *3 (finding law firm not a debt collector as a matter of law where percentage of revenue attributable to debt-collection cases was "2.9% of [the firm's] work out of 244 total cases"); *Rico v. Eveland*, No. 2:18-cv-644-JCB, 2020 WL 7414016, at *7 (D. Utah Dec. 17, 2020) (same where law firm pursued 63 debt-collection matters during nearly five-year period amounting to 0.87% of cases and less than 1% of revenue); *Young v. Kelly & Bramwell, P.C.*, No. 1:17-cv-144 TS, 2019 WL 2515782, at *2–3 (D. Utah June 18, 2019) (same where debt-collection cases were "0.56% of the total number of cases Defendants handled during [the relevant period] and the amount earned from those case equaled 0.22% of Defendants' total gross revenue"); *Reyes v. Julia Place Condo. Homeowners Ass'n, Inc.*, No. 12-cv-2043, 2017 WL 466359, at *3–4 (E.D. La. Feb. 1, 2017) (same where percentage of revenue attributable to debt-collection client "was less than 1.3%" during relevant period), *aff'd sub nom. Reyes v. Steeg L., L.L.C.*, 760 F. App'x 285 (5th Cir. 2019); *Milton v. Rosicki, Rosicki & Assocs., P.S.*, No. 2-cv-3052

---

[7]        Again, it was *Crandall* who identified the five-year period in her interrogatories.  *See* Def.'s Ex. J.  Miller & Stevens's answers to the interrogatories are dated February 19, 2021.  *Id.* at 23 [ECF No. 48-1 at 76].

(NG), 2007 WL 2262893, at *7 (E.D.N.Y. Aug. 3, 2007) (same where percentage of revenue derived from debt-collection activities was "less than 1% of its annual income").

Citing *Goldstein*, Crandall argues that this data might reasonably be construed to support a finding that Miller & Stevens regularly collects debts, but this is not persuasive. It is true that *Goldstein* reversed the entry of summary judgment for a defendant law firm though the firm "had derived only $5,000 in revenue from the issuance of [debt-collection] notices during the one-year period immediately preceding the commencement of [the] action, amounting to 0.05% of its $10,000,000 revenue over that period." 374 F.3d at 60. But it would be a mistake to understand *Goldstein* to say that such a low percentage ordinarily should favor the denial of summary judgment. *Goldstein* involved a law firm that generated $10 million in gross revenues annually, and the *Goldstein* court recognized explicitly that debt-collection activity "constituting 1% of the overall work or revenues of a very large entity may . . . suggest regularity, whereas such work constituting 1% of an individual lawyer's practice might not." *Id.* at 60, 63. A five-lawyer firm like Miller & Stevens, Def.'s Ex. B ¶ 8, is not "a very large entity." It is not comparable in size to the $10-million-per-year firm at issue in *Goldstein*. Further, *Goldstein* approvingly acknowledged cases in which "debt collector status was found lacking based on revenue or workload figures" because in those cases "other indicia of regularity often were also lacking[.]" 374 F.3d at 61. The bottom line is that *Goldstein* left the door wide open to considering revenue-percentage and similar data and to relying on it in appropriate cases to decide on summary judgment that a law firm is not a debt collector.

*Whether Miller & Stevens seeks debt-collection business by marketing itself as having debt-collection expertise.* Miller & Stevens says it does not. It avers that it "does no advertising or marketing for debt collections." Def.'s Ex. B ¶ 11. Specifically, Miller & Stevens says that "[d]ebt collections is never identified as an area of law in telephone books, social media, websites, online advertising, mailers, local billboards, or business networking organizations. The firm's website describes its areas of law, but never mentions debt collections." *Id.*

Crandall seems to take the position that Miller & Stevens markets itself as a debt-collection firm, and she identifies three items that "are relevant in this regard[,]" Pl.'s Mem. in Opp'n at 10; *see* Pl.'s Mem. in Supp. at 11, but these items do not raise a genuine fact dispute as to whether Miller & Stevens markets itself as a debt-collection firm. First, around the time Crandall brought this suit, a new attorney started with Miller & Stevens, and the new attorney temporarily included "landlord/tenant disputes" as a practice area. Pl.'s Ex. A at 16 [ECF No. 41-1 at 17]. The inclusion of this practice area on one attorney's list of practice areas does not reflect debt-collection marketing by Miller & Stevens. In addition to the *de minimis* character of this evidence, landlord/tenant disputes arise in many contexts that have nothing to do with debt collection. *See, e.g.*, *Adams v. Schneider*, No. 2:19-cv-0103-TOR, 2020 WL 5411378, at *4 (E.D. Wash. Sept. 9, 2020) ("Unlawful detainer actions are not debt collection activities."); *Todaro v. Reimer, Arnovitz, Chernek & Jeffrey Co.*, No. 1:16 cv 1480, 2016 WL 6777805, at *7 (N.D. Ohio Nov. 16, 2016) (holding that FDCPA did not apply because there was no unpaid rent involved). Second, Crandall identifies a blog post from the Miller & Stevens website entitled "What are my

23

legal options if I receive a collection letter?".  As the title suggests, the post is aimed at individuals who receive debt-collection letters, not those seeking to collect debts.  Crandall identifies no reason why a blog post directed at recipients of debt-collection letters might show that Miller & Stevens marketed debt-collection business.  Third, Crandall points to the fact that Miller & Stevens included the following sentence on its debt-collection letters (including the letter it sent her): "THIS IS AN ATTEMPT TO COLLECT A DEBT AND PURSUANT TO THE FAIR DEBT COLLECTION PRACTICES ACT, ANY INFORMATION RECEIVED SHALL BE USED FOR THAT PURPOSE."  Def.'s Ex. C. For many good reasons, federal courts have held that the inclusion of this kind of advisory does not make the sender a debt collector for purposes of the FDCPA.  *E.g.*, *Chomilo v. Shapiro, Nordmeyer & Zielke, LLP*, No. 06-cv-3103 (RHK/AJB), 2007 WL 2695795, at *5–6 (D. Minn. 2007); *Alexander v. Omega Mgmt., Inc.*, 67 F. Supp. 2d 1052, 1056 (D. Minn. 1999); *Golliday v. Chase Home Fin., LLC*, 761 F. Supp. 2d 629, 636 (W.D. Mich. 2011); *cf. Boosahda v. Providence Dane LLC*, 462 F. App'x 331, 334 (4th. Cir. 2012) ("[I]f the use of the statutorily required disclaimer is sufficient to establish an FDCPA claim, debt collectors will be placed in a conundrum, exposed to liability for both including the disclaimer and for omitting it.").

Applied here, the *Goldstein* analysis establishes as a matter of law that Miller & Stevens is not a "debt collector" for FDCPA purposes.  There is no genuine dispute that its debt-collection activities were irregular.  The Bear Roofing matters represented an unprecedented spike in the firm's debt-collection business in 2019.  It had not undertaken anything close to that volume of business before, and there is no record evidence suggesting

it will again (evidence that Crandall bore the burden to produce). Though an unprecedented spike, the Bear Roofing matters nonetheless represented a small fraction of Miller & Stevens's business overall. In other words, it was not a "significant aspect of the [law firm's] business." *Wadas*, 724 F.3d at 1317. The record evidence does not show either that Miller & Stevens assigned personnel specifically to work on debt-collection matters, that it ever had systems or contractors in place to facilitate such activities, or that it marketed itself as having debt-collection experience. Against these undisputed facts, the idea that the firm's relationship with Bear Roofing might reasonably be called "ongoing" (while it lasted) does not create a trial-worthy issue. The bottom line is that, in view of all these considerations, it would be unreasonable for a factfinder to determine that Miller & Stevens "regularly collects" debts.[8]

## B

The Parties each seek an award of attorneys' fees and costs under the FDCPA, specifically 15 U.S.C. § 1692k(a)(3). Crandall seeks an award on the assumption that this is a "successful action to enforce [FDCPA] liability." *Id.* Because this case does not fit that description, Crandall's request will be denied. Miller & Stevens, on the other hand, seeks an award of reasonable attorneys' fees and costs on the ground that Crandall brought her claims "in bad faith and for the purpose of harassment." *Id.* "[T]he context of

---

[8]    The determination that Miller & Stevens is not a "debt collector" for FDCPA purposes makes it unnecessary to consider the Parties' remaining arguments in support of their respective summary-judgment motions—*i.e.*, regarding the law firm's bona fide error defense and FDCPA liability.

§ 1692k(a)(3) indicates that Congress was simply confirming the background rule that courts may award to defendants attorney's fees and costs when the plaintiff brings an action in bad faith." *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 387 (2013).  As should be evident from the extensive discussion necessary to determine whether Miller & Stevens is a debt collector, it is not apparent that Crandall brought or pursued this case in bad faith or to harass Miller & Stevens.  The law firm's request will be denied.

V

As mentioned, Crandall asserts common-law tort claims under Minnesota law for malicious prosecution and abuse of process.[9]  To avoid summary judgment on her malicious-prosecution claim, Crandall must identify record evidence from which a factfinder may reasonably conclude: (1) that Miller & Stevens brought the Conciliation-Court case without probable cause or a reasonable belief that Bear Roofing ultimately would prevail on the merits; (2) that Miller & Stevens "instituted and prosecuted [the Conciliation-Court case] with malicious intent;" and (3) that the Conciliation-Court case terminated in Crandall's favor.  *Dunham v. Roer*, 708 N.W.2d 552, 569 (Minn. Ct. App. 2006) (quoting *Kellar v. VonHoltum*, 568 N.W.2d 186, 192 (Minn. Ct. App. 1997), *review denied*, (Minn. 1997)).  As the court explained in *Dunham*:

> "Probable cause for pursuing a civil action consists of such
> facts and circumstances as will warrant a cautious, reasonable

---

[9]     A district court may decline to exercise supplemental jurisdiction over state-law claims after dismissing "all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3).  Dismissal of Crandall's state-law claims on this basis would be wasteful.  The Parties have spent significant resources litigating this case.  Their summary-judgment briefs are extensive.  Their submissions include hundreds of pages of exhibits.  And Crandall's state-law claims arise from the same operative facts as her FDCPA claims.

> and prudent person in the honest belief that his action and the
> means taken in prosecution of it are just, legal and proper."
> *First Nat'l Bank of Omaha v. Marquette Nat'l Bank,* 482 F.
> Supp. 514, 522–23 (D. Minn.1979), *aff'd,* 636 F.2d 195 (8th
> Cir. 1980), *cert. denied,* 450 U.S. 1042 (1981).   Only
> "reasonable belief" that probable cause existed is necessary to
> negate a malicious prosecution claim. *Kellar*, 568 N.W.2d at
> 192. A cause of action for malicious prosecution "has always
> been carefully circumscribed, and not favored in law, the
> reason being that 'public policy favors . . . prosecutions and
> affords such protection of another in good faith and on
> reasonable grounds as is essential to public justice.'"
> *Lundberg v. Scoggins*, 335 N.W.2d 235, 236 (Minn.
> 1983) (citation omitted).

708 N.W.2d at 569. "[M]alice and probable cause are distinct elements in a malicious-

prosecution case." *Allen v. Osco Drug, Inc.*, 265 N.W.2d 639, 645 (Minn. 1978). For

purposes of a malicious-prosecution claim, "malice" is "the intentional doing of a wrongful

act without legal justification or excuse, or, otherwise stated, the willful violation of a

known right." *Rico v. State*, 472 N.W.2d 100, 107 (Minn. 1991) (quotation omitted). "[T]o

prevail on a malicious-prosecution claim, a plaintiff must prove, at a minimum, that the

defendant knew that its actions were wrong." *Hirtzinger v. Pinnacle Airlines, Inc.*, No.

06-cv-1609 (PJS/RLE), 2008 WL 835644, at *16 (D. Minn. Mar. 27, 2008) (citing *Osco

Drug, Inc.*, 265 N.W.2d at 646).

On this record, no reasonable factfinder could conclude that Miller & Stevens lacked

probable cause or possessed malicious intent when it filed the Conciliation-Court case

against Crandall. Everyone seems to agree that, but for Crandall's bankruptcy, Miller &

Stevens's pursuit of the Crandall's Bear Roofing debt was legitimate—*i.e.*, that the debt

was outstanding. It is true that the law firm's filing of the Conciliation-Court case was

improper because it violated the Bankruptcy Code's automatic stay. 11 U.S.C. § 362. But this violation resulted from the inaccurate information Bear Roofing provided to Miller & Stevens. Crandall identifies no authority suggesting that the law firm acted unreasonably or imprudently by relying on the information Bear Roofing provided or that prudence required the firm to investigate whether Crandall may have petitioned for bankruptcy.

Crandall advances two arguments to show that Miller & Stevens acted with malice. First, Crandall argues that "a reasonable jury could infer malice because Defendant lacked probable cause." Pl.'s Mem. in Opp'n at 28. It is true that the Minnesota Supreme Court has said "that in the proper case, malice may be, but need not be, inferred from the lack of probable cause." *Osco Drug, Inc.*, 265 N.W.2d at 645. The better understanding of this somewhat unclear statement is a recognition that, in some cases, probable cause may be so lacking that malice may be inferred or, put another way, the same evidence that shows reckless disregard also shows malice. That seems to have been the situation in *Osco Drug.* There, the defendant drug store's manager swore out a criminal complaint against the plaintiff for issuing an "insufficient funds check" though the plaintiff had explained to the manager and the police told the manager *immediately before he signed the complaint* that the plaintiff's "checkbook had been stolen and that several forged checks had been passed in [the city]." *Id.* at 641. Here, Miller & Stevens had probable cause to bring the Conciliation-Court case, but even if the firm lacked probable cause, the facts in this case do not resemble the facts in *Osco Drug*. Miller & Stevens's failure to investigate and discover Crandall's bankruptcy wasn't so blatant that it permits a reasonable inference of malice. Second, Crandall argues that certain actions the law firm took in defending this

suit show malice.  These include filing a complaint against Crandall's counsel with the Minnesota Office of Lawyers Professional Responsibility, seeking sanctions in this case against Crandall's counsel, and "demand[ing] legal fees from [Crandall]."  Pl.'s Mem. in Opp'n at 28.  These activities say a lot about Miller & Stevens's indignation toward Crandall's counsel and his filing and pursuit of this case.  They don't say anything about the law firm's state of mind when it filed the Conciliation-Court case against Crandall.

These same considerations warrant the entry of summary judgment against Crandall's abuse-of-process claim.  "The essential elements for a cause of action for abuse of process are the existence of an ulterior purpose and the act of using the process to accomplish a result not within the scope of the proceedings in which it was issued, whether such result might otherwise be lawfully obtained or not."  *Kellar*, 568 N.W.2d at 192.  "The test is whether the process was used to accomplish an unlawful end for which it was not designed or intended, or to compel a party to do a collateral act which he is not legally required to do."  *Dunham*, 708 N.W.2d at 571 (cleaned up).  Crandall argues that a reasonable factfinder could conclude that Miller & Stevens intended to accomplish an ulterior purpose that was "collateral" by finding that it "knew about the bankruptcy (via its own notice or that sent to its client) but pressed forward with the case, only stopping when contacted by another attorney."  Pl.'s Mem. in Opp'n at 26–27.  This is not persuasive.  No evidence permits a reasonable inference that the law firm possessed actual knowledge of Crandall's bankruptcy and filed the Conciliation-Court claim regardless.  And once begun, there is no question Miller & Stevens did not abuse the Conciliation-Court process.  The law firm dismissed the claim two days after receiving a letter from Crandall's bankruptcy

counsel giving notice of the proceeding and demanding that Bear Roofing "cease any and all collection efforts and dismiss this claim immediately." Def.'s Ex. F [ECF No. 48-1 at 20–22]; *see* Def.'s Ex. R [ECF No. 48-1 at 165–66].

**ORDER**

Based on all the files, records, and proceedings herein, **IT IS ORDERED THAT**:

1.    Plaintiff's Motion for Summary Judgment [ECF No. 39] is **DENIED.**

2.    Defendant's Motion for Summary Judgment [ECF No. 45] is **GRANTED**.

3.    This action is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  October 6, 2021                         s/ Eric C. Tostrud_____
                                                Eric C. Tostrud
                                                United States District Court